



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed September 25, 2020**                                **United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § § | |
| **Frederick Douglas Feigl,** | § § | Case No. 19-34156-hdh11 |
| Debtor. | § § | |
| | | |
| **Fairlane Fixed Income Fund, LLC,** | § § | |
| Plaintiff, | § § | |
| | § | Adv. Proc. No. 20-3011 |
| v. | § § | |
| **Frederick Douglas Feigl,** | § § | |
| Defendant. | § § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 30, 2020, Fairlane Fixed Income Fund, LLC (the "Plaintiff") filed a complaint[1] initiating the above-captioned adversary proceeding against Frederick Douglas Feigl (the "Defendant"). Through the Complaint, the Plaintiff seeks a finding that the Defendant should be denied a bankruptcy discharge or, in the alternative, that certain debts owed to it by the Defendant are nondischargeable. The Defendant is the former 50% owner and CEO of SafeBuy, LLC ("SafeBuy"), a used car dealership in Texas, and personally guaranteed a $1 million loan the Plaintiff made to SafeBuy (the "Fairlane Loan").[2] The Plaintiff generally contends that the Defendant never intended to perform under the terms of the Loan Agreement and Guaranty and that SafeBuy failed to (i) use the Fairlane Loan proceeds solely to purchase automobiles and (ii) keep the proceeds in a segregated account, which it was contractually required to do. The Plaintiff also alleges the Defendant withheld material information as to the pre-existing debts and obligations of SafeBuy and the concerns of other lenders. The Plaintiff ultimately seeks a determination that its claim against the Defendant is nondischargeable pursuant to Bankruptcy Code sections 523(a)(2)(A) and 523(a)(6). In addition, the Plaintiff seeks a global denial of the Defendant's discharge pursuant to sections 727(a)(5) and 727(a)(7).

The United States Bankruptcy Court for the Northern District of Texas temporarily suspended all live, in-person hearings in response to the COVID-19 pandemic.[3] Accordingly, the parties and the Court agreed to conduct a trial by video over three consecutive days beginning on August 3, 2020. After trial, the Court took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal

---

[1] *Complaint Objecting to Discharge of Frederick Douglas Feigl* [Docket No. 1] (the "Complaint").

[2] The documents associated with the Fairlane Loan include the Loan and Security Agreement (the "Loan Agreement") and Promissory Note, executed by Fairlane and SafeBuy (collectively, the "Fairlane Loan Documents"); and the Limited Payment Guaranty, executed by Fairlane and the Defendant (the "Guaranty").

[3] *See General Order 2020-14*; *General Order 2020-08*; *General Order 2020-05*.

Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[4] For the reasons set forth in greater detail below, the Court finds and concludes that in this case, the Plaintiff has not satisfied its burden to except its debt from discharge under sections 523(a)(2)(A) or 523(a)(6), nor has the Plaintiff shown the Defendant should be denied his discharge under sections 727(a)(5) or 727(a)(7).

## I. JURISDICTION AND VENUE

This Court has jurisdiction over the parties and claims asserted in this proceeding under 28 U.S.C. § 1334. The claims in this adversary proceeding are core matters under 28 U.S.C. § 157(b)(2)(A), (I), and (J), as they involve a determination as to the dischargeability of a particular debt and objections to discharge. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## II. PROCEDURAL HISTORY

On May 7, 2020 and May 8, 2020, the Plaintiff and the Defendant filed competing motions for partial summary judgment.[5] The Court held a hearing on the Summary Judgment Motions on June 15, 2020 and took the matters under advisement. On June 24, 2020, the Court entered an order[6] denying the Plaintiff's Summary Judgment Motion, as well as an order[7] granting, in part, the Defendant's Summary Judgment Motion on the Plaintiff's claims under section 727(a)(3). The Court ultimately determined that there were genuine issues of material

---

[4] Any Finding of Fact more properly construed as a Conclusion of Law shall be considered as such, and *vice versa*.

[5] *See Plaintiff Fairlane Fixed Income Fund, LLC's Motion for Summary Judgment on Section 523(a)(2)(A) Nondischargeability and Brief in Support* [Docket No. 15] (the "Plaintiff's Summary Judgment Motion"); *Defendant's Motion for Partial Summary Judgment on Plaintiff's Allegations under 11 U.S.C. § 727 and Brief in Support Thereof* [Docket No. 16] (the "Defendant's Summary Judgment Motion"). The Plaintiff's Summary Judgment Motion and Defendant's Summary Judgment Motion are collectively referred to as the "Summary Judgment Motions."

[6] *Order Denying Plaintiff's Motion for Summary Judgment* [Docket No. 42].

[7] *Order (I) Granting in Part and (II) Denying in Part Defendant's Motion for Partial Summary Judgment* [Docket No. 43].

fact with respect to (1) the Defendant's intent and the Plaintiff's reliance under section 523(a)(2)(A) and (2) the Defendant's explanations and credibility under section 727(a)(5).

On July 28, 2020, the Court signed and entered the *Amended Joint Pretrial Order*[8] submitted by the parties. It is well-established in the Fifth Circuit that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000). Accordingly, the Court focuses on the issues and causes of action raised in the Amended Joint Pretrial Order in this ruling.[9]

### III. FINDINGS OF FACT

#### A. The Parties

The Plaintiff's Private Placement Memorandum states the Plaintiff was formed for the purpose of originating high yield loans and that its loans "will typically be secured by real estate, business assets and/or guarantees that in the Manager's judgment adequately secure the underlying Loans." Jason Dodd is the founder and managing partner of the Plaintiff. Mr. Dodd is also the sole decision maker for the Plaintiff and authorized the Fairlane Loan.

The Defendant resides in Dallas County, Texas, and as previously stated, is the former 50% owner and CEO of SafeBuy. SafeBuy was formed in April 2010 and operated on a "buy here, pay here" model. The Defendant originally formed SafeBuy with another partner, William Plaster, but Leeman Stiles later came to own the other 50% of SafeBuy. While Mr. Stiles managed the day to day operations of SafeBuy, the Defendant attended auctions to purchase inventory and worked behind the scenes with the accounting department. At its height, SafeBuy

---

[8] Docket No. 50.

[9] The Amended Joint Pretrial Order preserves the Plaintiff's remaining causes of action raised in the Complaint but narrows some of the factual allegations.

was the fourth largest used car dealership in Texas with dozens of employees, including several responsible for SafeBuy's finance and accounting.

Mr. Dodd and the Defendant knew each other for years prior to this litigation. They both have children about the same age, and their daughters attended school together. At one point in time, Mr. Dodd and the Defendant considered themselves to be friends.

### B. The Fairlane Loan

In early 2018, the Plaintiff began looking to grow its fund. Mr. Dodd approached the Defendant and offered to loan money to SafeBuy even though the Plaintiff had never loaned money to the Defendant or a used car business before. The Defendant told Mr. Dodd that SafeBuy would use the Fairlane Loan proceeds to purchase inventory for resale and that the inventory would be aimed at a "higher end" consumer. On May 8, 2018, the Defendant sent an email to Mr. Dodd, stating "Take [sic] look!" with a spreadsheet of financial projections for the Fairlane Loan attached (the "Dodd Forecast").

The Dodd Forecast showed projections based on a fleet of 280 vehicles being purchased using the Fairlane Loan proceeds (the "Fund II Automobiles"). At trial, Mr. Dodd testified that while SafeBuy's purchase of 280 Fund II Automobiles was possible, he did not think it was likely. Mr. Dodd testified that he understood Fund II Automobiles would be purchased with funds from the Fairlane Loan, and the notes from the Fund II Automobiles would also serve as collateral (the "Fund II Auto Paper"). The Defendant testified that the Dodd Forecast was only a high-level model, early on in his discussions with Mr. Dodd, of how a potential portfolio could operate.

On June 1, 2018, the Plaintiff and SafeBuy entered into the Fairlane Loan Documents, which the Defendant executed on behalf of SafeBuy. The Defendant simultaneously executed the

5

Guaranty in his personal capacity. It is undisputed the Plaintiff knew SafeBuy had other lenders at the time the Fairlane Loan Documents were executed.[10] And at trial, Mr. Dodd admitted that the Plaintiff did not review any financials for SafeBuy or the Defendant prior to executing the Fairlane Loan Documents and the Guaranty.

The Loan Agreement contains the following provisions relevant to the Plaintiff's allegations in this case:

- "Borrower will maintain all Loan proceeds in a depository account that is used solely for the operations of Fund II and will not comingle such funds with any other funds or depository accounts held or controlled by Borrower. . . ." § 3.2(d).

- "Promptly following receipt by Borrower of Fund II Auto Paper, Borrower will endorse all promissory notes and chattel paper in favor of Lender on the face of such promissory notes and chattel paper, unless otherwise agreed by Lender." § 3.2(e).

- "Borrower's financial projections previously delivered to Lender were prepared by Borrower in good faith and accurately reflect the future cash flow and financial performance that Borrower's management team expects from Fund II, in all material respects." § 4.5.

- ". . . Borrower is not insolvent as defined in any Applicable Law, nor will it be rendered insolvent by the execution and delivery of the Loan Documents . . . ." § 4.12.

- Borrower will "[u]se the proceeds of the Loan solely for the purchase of Fund II Automobiles." § 6.12.

- The Plaintiff's collateral coverage "shall not be less than 125% of the outstanding principal balance under the Note. In the event of a breach of the covenant set forth in the preceding sentence, Borrower shall identify and grant to Lender a security interest in sufficient additional automobiles owned by Borrower (the "Replacement Collateral") necessary to cure such breach . . . ." § 3.3.

The Plaintiff loaned SafeBuy the full $1 million under the Loan Agreement in tranches of $250,000. The Plaintiff funded its first tranche on June 1, 2018, and the next on August 1,

---

[10] The Plaintiff discovered approximately eight or nine UCC filing statements against SafeBuy before the parties signed and executed the Fairlane Loan Documents and Guaranty.

2018.[11] During this time, the Plaintiff appears to have purchased some Fund II Automobiles, but very few. Instead, the Plaintiff took pre-existing automobile notes and placed them in a segregated safe to serve as Replacement Collateral for the Fairlane Loan. After the first two tranches of the Fairlane Loan were funded, the Plaintiff had its accountants perform an audit to verify compliance with the Fairlane Loan Documents. Pursuant to that audit, a memorandum was generated on September 18, 2018 (the "Mosel Memo").

The Mosel Memo noted that SafeBuy was not in compliance with the Loan Agreement. Critically, the Mosel Memo stated that (1) SafeBuy did not have any Fund II Automobiles and only had 89 automobile notes listed as Fund II Auto Paper; (2) SafeBuy was not segregating the proceeds from the Fairlane Loan as required by section 3.2(d) of the Loan Agreement and instead the funds from the Fairlane Loan were being immediately transferred to SafeBuy's general operating account and co-mingled with all other SafeBuy business activity; (3) of the 20 automobile notes selected for review, none contained the required endorsement as described in section 3.2(e) of the Loan Agreement; and (4) of the 20 automobile notes selected for review, 10 were notes related to vehicles sold prior the Plaintiff's first tranche of funding under the Fairlane Loan Documents. The Mosel Memo ultimately recommended that the Plaintiff stop funding until SafeBuy made changes to comply with the Loan Agreement.

Despite the information and recommendations contained in the Mosel Memo, the Plaintiff funded another tranche of $250,000 on October 1, 2018. At trial, Mr. Dodd testified that the Plaintiff continued to fund because the Mosel Memo indicated SafeBuy had 89 car notes listed as Fund II Auto Paper. Mr. Dodd understood this to mean (i) SafeBuy must have already

---

[11] The total amount of cash received by SafeBuy under the Fairlane Loan was slightly less than $1 million (approximately $930,000) on account of expenses and fees under the Fairlane Loan Documents that were deducted from the advances.

purchased and sold Fund II Automobiles with Fairlane Loan proceeds before the Mosel Memo was created and (ii) accordingly, the Plaintiff was collateralized with the Fund II Auto Paper.

Sometime in mid-October, however, the Plaintiff received a collateral report from SafeBuy (the "October Collateral Report"). The October Collateral Report showed that nearly all of the Plaintiff's collateral was purchased before SafeBuy received any funds from the Fairlane Loan. Mr. Dodd testified that he received the October Collateral Report but did not interpret it to mean that most of the Plaintiff's collateral was not purchased with Fairlane Loan proceeds. Mr. Dodd maintained the Fairlane Loan was only intended to be used to purchase Fund II Automobiles.

At trial, the Defendant agreed the Fairlane Loan was intended to be used to purchase Fund II Automobiles. However, he also believed the funds could be used to pay for SafeBuy's general operating expenses, to the extent that Fairlane was adequately collateralized with Fund II Auto Paper or Replacement Collateral under the Loan Agreement. While the Mosel Memo showed SafeBuy was undercollateralized by $7,609 in September 2018, SafeBuy's collateral reports from October 2018 to February 2019 showed Fairlane was adequately collateralized pursuant to the Loan Agreement. On November 30, 2018, the Plaintiff funded the remaining $250,000 of the Fairlane Loan to SafeBuy.

C. The Decline of the Business and the Bankruptcy Proceedings

SafeBuy's business began to suffer in late 2016 and was generally in decline. According to the testimony of Mr. Stiles, Safebuy was purchasing substantially fewer cars in 2017 and 2018, and its business was shifting more towards focusing on repossessions than new purchases. Mr. Stiles further testified that in 2018 and 2019, he and the Defendant were working to keep SafeBuy going so that it could continue to pay its debts. As part of these efforts, the Defendant

8

decreased his salary from SafeBuy over time, did not take any wages from SafeBuy in 2018, and sold his personal assets so that he could contribute money to SafeBuy between 2017 and 2019.

On September 14, 2019, several creditors filed an involuntary Chapter 11 bankruptcy petition against SafeBuy. Both Mr. Stiles and the Defendant testified that the involuntary bankruptcy greatly hampered their efforts to continue with repossessions and collection activity on SafeBuy's outstanding promissory notes. On October 14, 2019, SafeBuy filed its own voluntary Chapter 7 bankruptcy petition,[12] which triggered liability under the Guaranty. SafeBuy's involuntary bankruptcy case was subsequently converted to Chapter 7 and consolidated with its voluntary bankruptcy case.[13]

At the time the involuntary petition against SafeBuy was filed, SafeBuy had made all interest payments under the Fairlane Loan timely, but due to the Guaranty and numerous other personal guarantees the Defendant executed with other SafeBuy lenders, the Defendant sought Chapter 11 bankruptcy protection on December 18, 2019. The $1 million principal amount of the Fairlane Loan remains unpaid.[14]

D. Credibility Determinations and Expert Testimony

Several witnesses testified at trial aside from Mr. Dodd and the Defendant, including Mr. Stiles, Chad Bradshaw, and two expert witnesses—Greg W. Ginn and Michael J. Quilling.

Mr. Dodd was generally credible. He appeared to answer questions truthfully to the best of his recollection, but some of the statements Mr. Dodd gave at trial were inconsistent with the evidence and statements he made during his pre-trial deposition (the "Deposition"). For instance, at trial, Mr. Dodd testified that he would not have made the Fairlane Loan if it were not being

---

[12] Case No. 19-33450-bjh7.

[13] *See id.* The consolidated case can be found at Case No. 19-33084-sgj7.

[14] Under the Fairlane Loan Documents, SafeBuy was only required to make monthly interest payments until July 1, 2021. The Fairlane Loan had maturity date of April 1, 2022.

9

used to purchase Fund II Automobiles, but the Court is unable to reconcile this testimony with Mr. Dodd's decision to fund the final tranches of the Fairlane Loan even after reviewing the Mosel Memo and the October Collateral Report.[15] Mr. Dodd also testified at trial that he relied on the Dodd Forecast when he made the Fairlane Loan and that the Fairlane Loan was only ever intended to be used to purchase Fund II Automobiles. At the Deposition, however, Mr. Dodd did not testify that he relied on the Dodd Forecast as part of his diligence in making the Fairlane Loan and instead testified that he was "betting on the jockey, not on the horse." He also made a number of other statements that suggest he had not thought about whether some of the Fairlane Loan proceeds could be used for SafeBuy's operations. These statements undermine reliance and are consistent with the undisputed fact that Mr. Dodd did not review any financials for SafeBuy or the Defendant before he made the Fairlane Loan.

The Defendant was also generally credible, but certain parts of the Defendant's testimony do not square with the other evidence at trial. For instance, the Defendant credibly testified that he believed SafeBuy was still purchasing vehicles when it entered into the Fairlane Loan Documents. However, SafeBuy's tax documents and financial records show the company was operating at a loss, which coincides with Mr. Stiles's testimony that SafeBuy's business was in decline. And while the Defendant may have believed SafeBuy was using Fairlane Loan proceeds to buy Fund II Automobiles, the evidence at trial suggests the rate at which SafeBuy was purchasing cars had slowed considerably and the Fairlane Loan proceeds were predominately used to pay other SafeBuy-related expenses.

---

[15] While Mr. Dodd provided an explanation for how he could believe the Fairlane Loan was being used to purchase Fund II Automobiles even though reports kept showing that SafeBuy did not have any Fund II Automobiles, the October Collateral Report also showed the dates of sale for the vehicle notes being used to collateralize the Fairlane Loan, and almost all of those dates preceded the funding of the Fairlane Loan.

Both Mr. Stiles and Mr. Bradshaw were credible. Mr. Bradshaw was another lender to SafeBuy. Mr. Bradshaw testified about his relationship with the Defendant and SafeBuy, and about the communications he received from the Defendant concerning SafeBuy's decline in early 2019. Other than to show that Mr. Dodd did not receive the same communications from the Defendant as Mr. Bradshaw, the Court does not find Mr. Bradshaw's testimony particularly relevant.

Mr. Ginn was generally credible. Mr. Ginn is a certified public accountant and provided an expert tracing analysis as to how the Fairlane Loan proceeds were used. Mr. Ginn's analysis showed that after automobile notes were transferred to the collateral pool for the Fairlane Loan, the Fairlane Loan proceeds were transferred to SafeBuy's general operating account. After being transferred to SafeBuy's general operating account, roughly $127,000 of Fairlane Loan proceeds was used to pay prior creditors and roughly $578,000 was used to pay SafeBuy's general operating expenses.

Mr. Quilling was credible. Mr. Quilling is an experienced attorney who has served as a receiver and trustee for a number of entities across North America. In his opinion, neither the Defendant nor SafeBuy operated a Ponzi scheme.

## IV. <u>CONCLUSIONS OF LAW</u>

As previously stated, the Plaintiff seeks to except its debt from the Defendant's discharge under sections 523(a)(2)(A) and 523(a)(6), and also moves for a global denial of the Defendant's discharge under sections 727(a)(5) and 727(a)(7). Exceptions to and denials of discharge must be strictly construed against the creditor and liberally construed in favor of the debtor so that the debtor may be afforded a fresh start. *See FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011); *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 763 (Bankr.

N.D. Tex. 2005). The objecting creditor bears the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279 (1991).

### A. False Pretenses, False Representations, and Actual Fraud Under 11 U.S.C. § 523(a)(2)(A)

To obtain relief under section 523(a)(2)(A), the Plaintiff must show that the Defendant owed the Plaintiff a debt "for money, property, services, or an extension, renewal, or refinancing of credit" that was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The Fifth Circuit has distinguished the elements of "false pretenses and false representations" from "actual fraud." False representations and false pretenses within the meaning of section 523(a)(2)(A) require that the creditor prove (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, (iii) that was relied upon by the creditor. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995).

By contrast, a cause of action for actual fraud under section 523(a)(2)(A) exists when a debtor makes a promise of future action which, at the time it was made, he had no intention of fulfilling. *Bercier v. Bank of Louisiana (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). The creditor must prove that (1) the debtor made a representation; (2) the debtor knew that the representation was false at the time it was made; (3) the debtor made the representation with the intent and purpose to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as the proximate result of its reliance on the representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

In this case, the bulk of the Plaintiff's allegations concern representations SafeBuy made under the Loan Agreement. As an initial matter, the Court is hesitant to find that representations under the Loan Agreement may be imputed to the Defendant simply by virtue of the Guaranty or

the fact that the Defendant signed the Loan Agreement on behalf of SafeBuy.[16] While it is true the Defendant is liable for payment to the Plaintiff for any breach under the Loan Agreement, the Guaranty does not expressly provide the Defendant adopts SafeBuy's representations as his own. SafeBuy is a separate legal entity, and most of the misrepresentations at issue in this case were made by SafeBuy under the Loan Agreement.

To the extent SafeBuy's representations under the Loan Agreement are construed as representations made by the Defendant, representations that (i) SafeBuy would use the Fairlane Loan proceeds solely to purchase Fund II Automobiles, (ii) SafeBuy would keep the Fairlane Loan proceeds segregated from other funds, and (iii) SafeBuy was not insolvent, were false statements. However, the Plaintiff has not proven (i) the Defendant made the representations with the intent to deceive or (ii) the Plaintiff relied on the representations. As to the Defendant's representation that he intended to use the Fairlane Loan to purchase cars aimed at higher-end consumers, the Court also does not find intent to deceive on behalf of the Defendant and reliance on behalf of the Plaintiff.[17]

---

[16] *See DMM Grp., Inc. v. Hanna (In re Hanna)*, 603 B.R. 571, 584 (Bankr. S.D. Tex. 2019). The Plaintiff relies on the bankruptcy court's decision in *Hanna*, among others, in support of its arguments under section 523(a)(2)(A). *See Plaintiff Fairlane Fixed Income Fund, LLC's Trial Brief* [Docket No. 38]. But neither the *Hanna* court nor the Plaintiff seem to specifically address this issue. *See Hanna*, 603 B.R. at 584-85 (generally discussing elements of section 523(a)(2)(A) under guarantor liability). In addition, there are several key differences between this case and the *Hanna* case. In *Hanna*, the loan proceeds were immediately used, in part, to pay the debtor's extravagant personal expenses, and none were used for the original purpose of the loan. *Id.* at 586-87. In addition, the Court in *Hanna* found that the debtor never intended to repay the loan as promised. *Id.* at 587. In the present case, SafeBuy made monthly payments to the Plaintiff until the filing of the involuntary bankruptcy.

[17] Curiously, the Plaintiff's pleadings are silent as to the Dodd Forecast, but the Plaintiff appeared to lean on this heavily at trial to show reliance. The Court does not believe the Defendant's e-mail to the Plaintiff with the Dodd Forecast attached was a false statement for a few reasons.  First, it is not clear what representations were being made in the Dodd Forecast. The numbers do not reflect the actual deal terms in the Fairlane Loan Documents because the Dodd Forecast contemplates $1,000,000 being funded, but only about $930,00 was funded in the Fairlane Loan after deducting expenses. The Defendant testified that the Dodd Forecast was just a high-level model, early on in his discussions with Mr. Dodd, of how a potential portfolio could operate.  Second, the Defendant's e-mail to Mr. Dodd transmitting the Dodd Forecast did not contain any representations by the Defendant in his individual capacity. To the extent the Dodd Forecast is a false statement made by SafeBuy, the Court still finds a lack of intent and reliance.

The Plaintiff urges the Court to consider several key facts to find the Defendant had fraudulent intent. First, SafeBuy did not keep the Fairlane Loan proceeds segregated but immediately transferred them to its operating account. Second, SafeBuy used very little Fairlane Loan proceeds to purchase Fund II Automobiles and instead used them to pay other expenses and creditors. Third, the Defendant failed to tell the Plaintiff the extent of SafeBuy's debt and operating losses.

Despite these facts, the Court believes the Defendant was credible when he explained he did intend to use the Fairlane Loan to purchase Fund II Automobiles even though not many were subsequently purchased. The Court also believes the Defendant was credible when he explained he tried to work within the Loan Agreement even though it was not structured for the used car business in the way that a typical floor-plan financing agreement is. The Defendant complied with certain provisions of the Loan Agreement and did not conceal his non-compliance with others. The Defendant explained that it was reasonable to believe he could use the Fairlane Loan proceeds to pay for operations and other debts if the Plaintiff was adequately collateralized. The Defendant credibly testified that he believed the Plaintiff was adequately collateralized with Fund II Auto Paper or Replacement Collateral, as called for by the Loan Agreement, except for a slight deviation in September 2018. While the mechanics of the deal may not have been honored, it appears that the Defendant's intent was always that SafeBuy would perform all of the payment obligations under the Loan Agreement.

With regard to the complaint that the Defendant failed to disclose to Fairlane the concerns of other lenders that were being expressed to him, the Defendant testified credibly that he did not believe his discussions with other lenders were entirely relevant to Fairlane because

the Defendant believed the Fairlane Loan had segregated collateral and the Fairlane Loan was current.

In addition, the parties' course of conduct strongly cuts against the required reliance element under section 523(a)(2)(A). The Plaintiff was made aware that SafeBuy was not in compliance with the Loan Agreement in the Mosel Memo and the subsequent October Collateral Report. While Mr. Dodd testified that he was assured everything would be fine, "a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he . . . [made] a cursory examination or investigation." *Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409, 423 (Bankr. N.D. Tex. 2006). Here, the Mosel Memo identified these issues, but the Plaintiff continued to fund the remaining two tranches, equal to half of the Fairlane Loan, with this knowledge.

Last, the Plaintiff contends that SafeBuy's use of the Fairlane Loan proceeds to pay its prior lenders meant that SafeBuy was operating a fraudulent scheme—specifically, a Ponzi scheme. The Supreme Court recently held that the term "actual fraud" as used in section 523(a)(2)(A) encompasses fraudulent conveyance schemes, even if those schemes did not involve a false representation by the debtor. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016). The Court finds it notable, however, that the fraudulent scheme at issue in *Husky* involved a debtor who drained funds of one entity and transferred those funds to other entities the debtor owned or controlled to avoid paying creditors. Here, the Defendant made relatively minimal payments to other lenders with the Fairlane Loan proceeds, none of which directly benefitted him or other insiders. While this was a breach of the Loan Agreement, it hardly amounts to a Ponzi scheme. In fact, the Defendant reduced his salary from SafeBuy and even wound up contributing money to SafeBuy between 2017 and 2019. Ultimately, the Court

concludes that—at least with respect to the Plaintiff—neither SafeBuy nor the Defendant operated a fraudulent scheme within the meaning of section 523(a)(2)(A).

### B. Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6)

Alternatively, the Plaintiff argues the Fairlane Loan should be excepted from the Defendant's discharge under section 523(a)(6) of the Bankruptcy Code. Section 523(a)(6) excepts from discharge any debt incurred for the willful and malicious injury by the debtor to another entity. To find the debtor's injury is "willful and malicious" within the meaning of section 523(a)(6), the movant must establish "either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).

Under the circumstances, the Court does not find the Defendant's actions to have been willful and malicious. The Plaintiff has not proven either an objective substantial certainty of harm or a subjective motive to cause harm.

The Court also generally agrees with the Defendant that this exception to discharge is so narrowly tailored, it is rarely successfully litigated.[18] And while not dispositive, the Court is hesitant to find a willful and malicious injury in the context of a breach of contract rather than a tort claim.[19] Rather, the Court generally believes the consequences of a debtor's alleged misrepresentations and failure to perform certain contractual obligations flow more naturally from other sections of 523.

---

[18] *See Defendant Frederick Douglas Feigl's Trial Brief* at ¶ 27 [Docket No. 39].

[19] *See* 4 Collier on Bankruptcy ¶ 523.12[1] (Alan Resnick & Henry J. Sommer eds., 16th ed. rev. 2020) ("Section 523(a)(6) generally relates to torts and not to contracts." Further, "courts must be careful to preserve the elements of nondischargeability . . . found in other, more specific [] subsections of section 523(a). . . ."); *see also* Jonathon S. Byington, *Debtor Malice*, 79 Ohio St. L.J. 1023, 1054-55 (2018) (arguing that the term "malicious" in section 523(a)(6) should be interpreted to require an "extraordinarily wrongful act").

### C. Failure to Explain Loss or Deficiency in Assets Under 11 U.S.C. § 727(a)(5)

The Plaintiff also seeks a global denial of the Defendant's discharge under section 727(a)(5). Section 727(a)(5) provides the court shall deny a debtor his discharge when "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." The creditor bears the initial burden to identify assets that have been lost or diminished, which shifts the burden to the debtor to provide a satisfactory explanation. *See In re Bullough*, 358 B.R. 261, 285 (Bankr. N.D. Tex. 2007). In the Fifth Circuit, "satisfactorily" means "reasonable," or "that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that [it] believes the explanation . . . ." *Cadle Co. v. Orsini (In re Orsini)*, 289 F. App'x 714, 720 (5th Cir. 2008) (quoting *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1983)).

Ultimately, the Court believes the Defendant has satisfactorily explained the losses and deficiencies of both his and SafeBuy's assets under the standard in this Circuit. At trial, the Plaintiff mainly focused on losses and deficiencies sustained by SafeBuy. The Plaintiff argued the Defendant gave no explanation as to (i) where the proceeds from the Fairlane Loan went and (ii) the loss of SafeBuy's automobile notes and inventory that served as the Plaintiff's collateral.

With respect to the Fairlane Loan funds, the Court believes the Defendant's testimony at trial, coupled with SafeBuy's financial records, are sufficient, particularly in light of the fact that the Defendant is not in control of SafeBuy's business records. Moreover, the Plaintiff's own expert tracing analysis shows where most of the Fairlane Loan proceeds went, and to the extent it did not identify exactly where all of the Fairlane Loan proceeds went, the tracing analysis gave a good idea of how they were being used.

As to the Plaintiff's collateral, the Defendant testified that funds from the Fairlane Loan were used to buy car notes in addition to some Fund II Automobiles to keep the Plaintiff collateralized at 125% under the Loan Agreement. At trial, the Plaintiff argued that many of the notes used by SafeBuy as Replacement Collateral were already pledged to other creditors, and accordingly, it was never adequately collateralized under the Loan Agreement. The Defendant disagreed that the notes were pledged to other creditors. The Defendant credibly testified that he believed SafeBuy used cash to pay for notes to serve as collateral for the Fairlane Loan, the records for which are in the hand of SafeBuy's Chapter 7 Trustee. While the Plaintiff may not like the Defendant's answer, the Court is satisfied the Defendant has provided a credible explanation to defeat the Plaintiff's claim under section 727(a)(5) in this case.

### D. Acts Committed Within One Year of Petition Date Under 11 U.S.C. § 727(a)(7)

The Plaintiff last argues that the Defendant should be denied his discharge under section 727(a)(7). Specifically, the Plaintiff argues the Defendant committed acts specified in section 727(a)(5) within one year of the petition date, while the Defendant was an insider of SafeBuy, in connection with SafeBuy's bankruptcy case. For the same reasons the Court concluded the Defendant prevails under section 727(a)(5), the Plaintiff's claim under section 727(a)(7) fails as well.

### V. CONCLUSION

The Plaintiff frames this case as one of fraud, false pretenses, and willful and malicious injury. The Defendant frames this case as a failure to perform—not fraud. The Defendant claims he always intended to use the Fairlane Loan to build a portfolio for the Plaintiff and repay the loan but that business realities and the parties' course of conduct led to a different understanding than what was actually provided for under the Loan Agreement.

There are a few problems with the Plaintiff's claims. The first is that the Plaintiff tends to conflate the Defendant and SafeBuy with regard to both representations that were made and with responsibility for business records. SafeBuy was not a small operation run by a single person. SafeBuy had dozens of employees, including several that were responsible for accounting and finance. And critically, the Defendant is no longer in control of SafeBuy or its business records.

The second problem in this case is that the Fairlane Loan Documents were not well-designed for the used car business and did not lend themselves to literal compliance. The Defendant testified that he understood that he was to construct a portfolio for the Plaintiff that could include Fund II Automobiles, Fund II Auto Paper, or Replacement Collateral, as long as the collateral was sufficient. While the Loan Agreement states that the Fairlane Loan was only to be used to purchase Fund II Automobiles, Mr. Dodd acknowledged that, at least initially, the collateral pool would have to include pre-existing notes for automobiles that were not purchased with the Fairlane Loan proceeds. This was how the portfolio had to begin, both because SafeBuy could not immediately purchase enough Fund II Automobiles with the proceeds of the Fairlane Loan, and because of the requirement in the Loan Agreement that the Plaintiff's collateral coverage needed to be 125% of the outstanding principal balance.

Unfortunately, the portfolio never evolved into what Mr. Dodd envisioned, with new Fund II Automobiles being purchased and replaced by performing Fund II Auto Paper. This probably had to do with SafeBuy's declining sales volume and the Defendant's understanding that the collateral pool could be composed of Fund II Automobiles, Fund II Auto Paper, or Replacement Collateral, which it was.

Nevertheless, the Defendant does not appear to have made any secret of SafeBuy's non-compliance under the Loan Documents. SafeBuy did not obstruct the Plaintiff's audits and

continued to provide monthly collateral reports to the Plaintiff, and the Plaintiff did not seem to have a problem continuing to advance additional funds even after discovering the non-compliance. While the Defendant did not communicate about ongoing business problems with the Plaintiff in the same way that he communicated with other creditors, he testified that this was because he believed the Plaintiff was in a different situation with a dedicated collateral pool and, further, the Fairlane Loan was current.

The Defendant appears to have genuinely intended to continue to operate SafeBuy and perform all payment obligations under the Fairlane Loan. The Defendant lowered his salary from SafeBuy, eliminated it altogether, and then contributed his own money to the business. SafeBuy continued to pay the Fairlane Loan. At least with respect to the Plaintiff, this was not a fraudulent scheme.

Ultimately, like many dischargeability trials, this case came down to the burden of proof, and the Plaintiff did not satisfy its burden on several elements of each of its causes of action. The Plaintiff was not able to show by a preponderance of the evidence that the Defendant made false representations with the intent to deceive or that the Plaintiff relied on the false representations. In addition, the Court believes the Defendant has satisfactorily explained the losses and deficiencies of both his and SafeBuy's assets under the standard in this Circuit. For all these reasons, the Defendant should be entitled to a fresh start, and a judgment will be entered in favor of the Defendant.

###END OF FINDINGS AND CONCLUSIONS###